Carlos A. Zelaya, II (*Pro Hac Vice pending*)
F. Gerald Maples, P.A.
365 Canal Street
Suite 2650
New Orleans, LA 70053
Phone:  504-569-8732
Fax:  504-525-6932

Joseph C. Wilson (SBN # 249027)
5A Funston Avenue
San Francisco, CA 94129
Phone: (415) 420-4009
Fax: (415) 796-0875

Attorneys for Applicants

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re* Application of:<br><br>**Daniel Carlos Lusitand Yaiguaje, et. al.**<br><br>**Applicants,**<br><br>**For the Issuance of Subpoenas for the Taking of Depositions and the Production Of Documents in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782.** | Case No. _____<br><br>**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 FOR EXPEDITED SERVICE AND ENFORCEMENT OF SUBPOENA FOR USE IN A FOREIGN PROCEEDING** |

1

**TABLE OF CONTENTS**

2  INTRODUCTION ............................................................................................................. 1

3  FACTS ............................................................................................................................. 4

4  I.    The Ecuadorian Case Underlying the Instant § 1782 Discovery Proceeding:
5        Chevron's Contamination of the Amazonian Rainforest ...................................... 4

6  II.   The Ecuadorian Plaintiffs Filed Their Original Lawsuit In Federal Court In
7        New York. ............................................................................................................. 5

8  III.  The Ecuadorian Plaintiffs Re-Filed Their Lawsuit In Ecuador. ........................... 6
9
   IV.  Borja Attempted A "Sting Operation" Against The Lago Agrio Court. .............. 7

10 V.    Borja Has Since Described His More Complex Relationship With Chevron,
        As Well As His And Portilla's Knowledge And Possession Of Other
11       Evidence. .............................................................................................................. 10

12 ARGUMENT ................................................................................................................. 13

13 I.    Under 28 U.S.C. § 1782 The Ecuadorian Plaintiffs Are Entitled To The
        Requested Discovery ........................................................................................... 13
14
        A.    The Discovery Sought Satisfies The Statutory Requirements Of § 1782
15            And Is Highly Relevant To The Lago Agrio Litigation ........................... 14

16
        B.    The Intel Discretionary Facts Also Favor Granting the Requested
17            Discovery ................................................................................................. 15

18 II.   The Requested Discovery Is Needed On An Expedited Basis And This
        Court Should Enter An Abbreviated Briefing Schedule .................................... 18
19
   CONCLUSION ............................................................................................................... 18
20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2  **CASES**

3  *Aguinda v. Chevron Corp.*, Case No. 002-2003, Superior Court of Nueva Loja (May 7, 2003) .... 6

4  *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001)................................................... 1, 5

5  *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002)........................................................ 1, 5

6  *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996)........................................................ 1

7  *In re Bayer AG,* 146 F.3d 188, 195-96 (3d Cir. 1998)................................................................. 14

8  *In re Compania Chilena de Navegacion Interoceanica S.A.*, Case No. 03 CV 5382 (ERK), 2004
   U.S. Dist. LEXIS 6408, at *12-13 (E.D.N.Y. Jan. 29, 2004) ...................................................... 16

9

   *In re Merck & Co.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000)........................................................... 14

10
   *In re Noboa*, Nos. MI8-302, M19-111, 1995 U.S. Dist. LEXIS 14402, at *1-2,11-12 (S.D.N.Y.
11   Oct. 3, 1995)............................................................................................................................. 16

12  *In re Republic of Ecuador*, Case 1:10-mc-00040-GSA (E.D.Cal. filed 09/14/2010) ................... 10

13  *In Re Republic of Ecuador*, No. 3:10-mc-80225-CRB (N.D.Cal. filed 12/01/2010).................... 17

14  *Intel Corp.* v. *Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65 (2004)................. 4, 13, 14, 15

15  *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) ......................................................................... 1

16  *London* v. *Does 1-4,* 278 Fed. Appx. 513, 515 (9th Cir. 2008) ........................................... 4, 13, 15

17  *Republic of Ecuador* v. *Chevron Texaco Corp.,* 499 F. Supp. 2d, 452, 456 (S.D.N.Y. 2007) ........ 5

18
   **STATUTES**
19
   28 U.S.C. § 1782 ................................................................................................................... passim
20

21  **OTHER AUTHORITIES**

22  Ley de Agua [Water Law], R.O. 369 (Mar. 30, 1972)...................................................................... 4

23  Ley de Hidrocarburos, DS 1459, R.O. 322 (Oct. 1, 1971)............................................................... 4

24  N.Y. C.P.L.R. 5304 ......................................................................................................................... 5

25
   **RULES**
26
   Fed. R. Civ. P. 45 ............................................................................................................................ 2
27
   Fed. R. Civ. P. 30 ............................................................................................................................ 2
28

---

ii

1

**INTRODUCTION**

2      In 1993, a group of indigenous persons and residents of the Ecuadorian Amazon

3   ("Ecuadorian Plaintiffs") sued Texaco, Inc., ("Texaco") a predecessor to Chevron Corporation

4   ("Chevron"), for environmental damages in the Southern District of New York, the site of

5   Texaco's then-global headquarters.[1] After Texaco was acquired by Chevron, Chevron fought

6   vigorously for ten years to re-venue the litigation from the Southern District of New York to

7   Ecuador.[2] Chevron successfully convinced the New York federal court to dismiss the case under

8   the *forum non conveniens* doctrine, arguing that venue was not proper in the United States, that

9   the Ecuadorian courts were the proper forum, and that the Ecuadorian courts would fairly

10  adjudicate the case. The Ecuadorian Plaintiffs vigorously opposed Chevron's motion, but lost.

11     By the time the New York court dismissed the case, Chevron (including its merged and

12  incorporated entity Texaco) no longer had any significant assets in Ecuador. When Ecuadorian

13  Plaintiffs re-filed their complaint in Ecuador in 2003, Chevron knew that Ecuadorian Plaintiffs

14  would need to return to the United States, or another jurisdiction where Chevron actually had

15  assets, to enforce any resulting judgment. Consequently, Chevron has initiated collateral

16  litigation attacks in more than a dozen U.S. federal districts, international treaty arbitrations and

17  taken various other actions, with the purpose of laying the groundwork to defeat any action to

18  enforce judgment from the Ecuadorian Court that Chevron had previously argued was the best

19  suited to adjudicate Ecuadorian Plaintiffs' Claims.

20     Now that a conclusion in the Ecuadorian trial court appears imminent year – 18 years after

21  the Ecuadorian Plaintiffs filed their initial complaint in New York – Chevron is essentially trying

22  to re-litigate the case through a series of 28 U.S.C. § 1782 actions in the United States – the very

23  forum it rejected as improper in the 1990s. Chevron has initiated eighteen 28 U.S.C. § 1782

24

25         [1] *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

26         [2] *See Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated by Jota v.
    Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534
27  (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470, 476 (2d Cir. 2002).

28

1

1    lawsuits against dozens of parties throughout the country. Chevron has sued over twenty of

2    Ecuadorian Plaintiffs' experts, a documentary filmmaker and his associates, two of Ecuadorian

3    Plaintiffs' former attorneys, and Ecuadorian Plaintiffs' current lead counsel. Over 275,000

4    documents have been produced. Chevron has successfully obtained more depositions than what

5    even would be allowed under Federal Rule of Civil Procedure 30. As Chevron proudly boasts in

6    briefs submitted in other jurisdictions, its applications for § 1782 discovery submitted in "aid" of

7    the Lago Agrio Litigation have never been denied.

8            In short, Chevron has used every tactic available in multiple jurisdictions to (1) attack the

9    Ecuadorian proceedings; (2) attack the Ecuadorian Plaintiffs and their agents; (3) exhaust the

10   Ecuadorian Plaintiffs' resources; and (4) escape both U.S. and Ecuadorian jurisdiction over the

11   underlying environmental claims. The company has also initiated, and spent enormous sums of

12   money. On, media blitzes attacking the Ecuadorian Plaintiffs and the Ecuadorian judicial system,

13   and Chevron has regularly exploited its intimate relationship with the Ecuadorian authorities.

14   This includes meeting secretly with Ecuadorian presidents to threaten them with withdrawal of

15   U.S. trade benefits unless the government quashes the trial, and working closely with top military

16   officials to spy on Ecuadorian Plaintiffs. In fact, Chevron on at least one occasion went so far as

17   to produce a fake "intelligence report," which it used to attack Ecuadorian Plaintiffs. In short,

18   Chevron has gone to extraordinary lengths and employed the full force of its vast resources to

19   frustrate the Ecuadorian Plaintiffs' efforts to obtain a fair trial.

20           In order to defend their environmental claims, the Ecuadorian Plaintiffs require discovery

21   from Respondent Diego Fernando Borja Sanchez, who has engaged in activities designed to

22   undermine trial in Ecuador, and who, upon information and belief, with his wife, Respondent

23   Sara Portilla, improperly handled and/or tampered with evidence, for Chevron's benefit,

24   throughout the environmental inspection phase of the trial. Under 28 U.S.C. § 1782, "[t]he

25   district court of the district in which a person resides or is found may order him to give his

26   testimony or statement or to produce a document or other thing for use in a proceeding in a

27   foreign or international tribunal." The Ecuadorian Plaintiffs request that this Court issue a Fed.

28   R. Civ. P. 45 subpoena addressed to Mr. Borja and Ms. Portilla, who reside in this judicial

2

1 | district, to provide depositions and documents for use in the Lago Agrio ("Lago") trial regarding
2 | issues raised in Ecuador by Chevron's motions in the Lago Agrio Court.

3 |     The requested discovery is directly relevant to the case currently pending in Ecuador, the
4 | venue Chevron initially preferred and in which it forced Ecuadorian Plaintiffs to litigate. Among
5 | the evidence sought is evidence regarding the reliability of the soil samples on which Chevron's
6 | expert reports are based, which is directly relevant to the environmental damage claim. Chevron
7 | is seeking to have an expert damage assessment report excluded based, in part, on that report's
8 | inconsistency with Chevron's own reports: the latter reports are based on soil samples over which
9 | Borja and Portilla had custody and control. Indeed Borja has admitted no engaging in what he
10 | has described as a "dirty tricks" operation, involving those soil samples, designed to support
11 | Chevron's litigation strategy. Specifically, Borja replaced soil samples taken from contested
12 | contaminated waste pit sites with "clean" samples and submitted the "clean" samples to the
13 | "independent" lab that he and Portilla ran for Chevron. This lab, acting through Borja and
14 | Portilla, then apparently submitted the "clean" samples to Chevron's experts who in turn passed
15 | their results on to several experts appointed by the Ecuadorian Court.

16 |     The requested discovery is also directed relevant to Chevron's recent attempts to subvert
17 | the judicial process in the Ecuadorian Court. Even though Chevron spent 10 years in U.S. Courts
18 | arguing that Ecuadorian courts were the fairest and most appropriate venue, as the Lago Agrio
19 | Litigation draws to a close, Chevron is now remarkably attacking the Ecuadorian trial as a
20 | "sham." It relies, in large part, on videotapes surreptitiously recorded in a failed "sting" operation
21 | by Mr. Borja and his companion, Wayne Hansen, a convicted drug trafficker who has apparently
22 | recently turned to corporate espionage. While they show no such thing, Chevron has claimed
23 | these videos show that Judge Juan Nuñez, who formerly presided over the Lago action, was
24 | biased in the Ecuadorian Plaintiffs' favor.[3] Chevron previously filed motions seeking to vacate

25 |

26 |    [3] Following Chevron's massive public relations campaign against him in both the United
27 | States and Ecuador, Judge Nuñez denied any wrongdoing but nevertheless ultimately felt
   compelled to recuse himself to avoid tainting the trial with even an appearance of impropriety.

28 |

1   *all* activity that took place during Judge Nuñez's 18-month tenure, and Chevron is likely to rely

2   on these motions to form the basis of an appeal from any judgment entered.  The Ecuadorian

3   Plaintiffs must gain access to discovery from Borja as one of the principle participants in this

4   unseemly scheme by which Chevron seeks to subvert the Ecuadorian Plaintiffs' long pursuit of

5   justice.

6       A subpoena under § 1782 is proper where: (i) the targets of the subpoena reside this

7   district, (ii) the discovery is sought for use in a foreign proceeding, and (iii) the applicant is an

8   interested person in the foreign proceeding.  Those requirements are easily met here.  This

9   subpoenas is also supported by the four discretionary factors articulated by the Supreme Court in

10   *Intel*: (1) Borja and Portilla are not parties in the Ecuadorian proceedings (but have a long history

11   of involvement with the proceedings); (2) the Ecuadorian court is not unreceptive to judicial

12   assistance from the United States; (3) the discovery request does not violate Ecuador's evidence-

13   gathering restrictions; and (4) the discovery request is not "unduly intrusive or burdensome."[4]

14   Applied to the facts at bar, the *Intel* factors militate in *favor* of the requested discovery as do basic

15   and fundamental .

16                       **FACTS**

17   **I.**     **The Ecuadorian Case Underlying the Instant § 1782 Discovery Proceeding:**

18         **Chevron's Contamination of the Amazonian Rainforest**

19       From 1964 through 1992, Chevron built and operated massive oil exploration and

20   production facilities in Ecuador's Amazon rain forest.  With tragic consequences, Chevron

21   violated the required best practices standards,[5] implementing a number of cost-cutting measures

22

23       [4] *London* v. *Does 1-4,* 278 Fed. Appx. 513, 515 (9th Cir. 2008) (quoting *Intel Corp.* v. *Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65 (2004)).

24       [5] *See, e.g.,* Ley de Hidrocarburos, DS 1459, R.O. 322 (Oct. 1, 1971) (requiring Chevron

25   to "employ modern and efficient machinery," "adopt measures necessary to protect the flora, fauna and other natural resources," and "avoid contamination of the water, air, and ground"); Ley

26   de Agua [Water Law], R.O. 369 (Mar. 30, 1972) (prohibiting "all contamination of the water that could affect human health or the development of the flora or fauna" and any person breaching this

27   directive "must withdraw the work and return things to their prior state").

28

1   that resulted in the discharge of *all* "water of production" (well water mixed with toxic heavy

2   metals and saline fluids) directly into the streams and rivers used by the surrounding population

3   for drinking and bathing, and dumping drilling wastes into unlined waste pits near each well.

4   These cost-saving measures were flatly prohibited in other countries where Chevron was

5   operating during that same time period.   The resulting contamination of the Amazonian

6   environment – and Ecuadorian Plaintiffs' homes – remains unprecedented in history.

**II.   The Ecuadorian Plaintiffs Filed Their Original Lawsuit In Federal Court In New York.**

In 1993, indigenous persons and residents of the contaminated Concession area sued Chevron in the Southern District of New York ("*Aguinda* action").   In *Aguinda*, the Ecuadorian Plaintiffs asked the court to, in part, compel Chevron to remediate the polluted environmental resources, provide medical monitoring, and grant monetary damages related to health injuries and other harm to the local communities.[6]

Chevron filed a motion to dismiss the *Aguinda* action based on *forum non conveniens* grounds, arguing that the conflict should be decided by the Ecuadorian courts.   Chevron submitted affidavits from legal experts stating that the Ecuadorian courts would provide the most appropriate, fair and adequate forum for the Ecuadorian Plaintiffs' claims, and litigated the case to dismissal over the course of nine hard-fought years.[7]   As part of the dismissal, Chevron agreed to consent to Ecuadorian jurisdiction subject only to its rights to (1) appeal in Ecuador, and (2) defend against enforcement *only* under the specific defenses set forth in New York's Recognition of Foreign Country Money Judgments Act, N.Y. C.P.L.R. 5304.[8]   Chevron expected the case to disappear upon dismissal.   It did not.

---

[6] *Aguinda* v. *Texaco, Inc.,* 303 F.3d 470, 473-74 (2d Cir. 2002); *Republic of Ecuador* v. *Chevron Texaco Corp.,* 499 F. Supp. 2d, 452, 456 (S.D.N.Y. 2007).

[7] *Aguinda Texaco, Inc.,* 142 F. Supp. 2d 534, 544-46 (S.D.N.Y. 2001).

[8] *Id.*

5

1

### III.   The Ecuadorian Plaintiffs Re-Filed Their Lawsuit In Ecuador.

2

3

4

5

6

7

8

9

In May 2003, despite warnings by many Ecuadorian observers that the case could be easily corrupted and "disappeared" by such a powerful multinational corporation as Chevron, Ecuadorian Plaintiffs re-filed their claims in the Superior Court of Nueva Loja (the "Lago Agrio Court"). Ecuadorian Plaintiffs alleged, as they had in *Aguinda*, that Chevron caused profound environmental contamination in the Concession area, harming the local Amazonian residents, and that Chevron's willful misconduct and negligence caused severe soil and water contamination, impacting the local population's drinking water, resources, crops, livelihood, culture and general health, thereby causing cancer, birth defects, and other illnesses.[9]

10

11

12

13

14

15

16

17

18

19

20

21

This complaint, although filed under Ecuador's civil law system which differs in several significant ways from the U.S. common law system (a fact that Chevron robustly acknowledged and approved of in pleadings in before courts in New York),[10] echoed the language from the *Aguinda* complaint as much as possible. The Ecuadorian Plaintiffs demanded that Chevron: (i) establish medical monitoring and care for affected residents; (ii) remove the waste pits and other pollution hazards; and (iii) remediate both private and public land and repair the environmental damage Chevron caused when it was the sole Operator in the Concession.[11]   The Lago Agrio action has proceeded in Ecuador since 2003. Dozens of judicial site inspections have occurred, thousands of test samples have been taken, and tens of thousands of pages of reports have been submitted by experts (appointed by the court under a complicated plan of party-suggested nominations, agreed to by both Chevron and the Ecuadorian Plaintiffs) who investigated and analyzed the pollution's causes, extent and effects. No decision has been issued yet.

22

23

24

25

[9] *See* Hall Decl., Ex. A, Lago Complaint: *Aguinda v. Chevron Corp.*, Case No. 002-2003, Superior Court of Nueva Loja (May 7, 2003) at §§ I(5), I(7), III (1)-(5), IV (5)-(6), IV (9).

26

[10] *See* Hall Decl., Ex. B, Excerpts from affidavits filed by experts on behalf of Chevron in the *Aguinda* proceedings in the S.D.N.Y.

27

[11] *See* Hall Decl., Ex. A, Complaint, at § VI.

28

6

1

**IV.    Borja Attempted A "Sting Operation" Against The Lago Agrio Court.**

2

On August 31, 2009, with much ado, Chevron announced that it had "uncovered" what it

3

described as a "bribery scheme" in which Diego Borja and Wayne Hansen attempted

4

(unsuccessfully) to convince several Ecuadorians that they were willing and able to bribe Judge

5

Nuñez and various other Ecuadorian government officials.  Baldly mischaracterizing the contents

6

of video taken by Borja and Hansin during the scheme, Chevron stated the following in a

7

triumphant press release:

8
9
10
11
12
13
14
15
16
17

> Chevron Corp .... today provided authorities in Ecuador and the
> U.S. with video recordings that reveal a $3 million bribery scheme
> implicating the judge presiding over the environmental lawsuit
> currently pending against the company and individuals who identify
> themselves as representatives of the Ecuadorian government and its
> ruling party. In the videos, the judge confirms that he will rule
> against Chevron and that appeals by the energy company will be
> denied - even though the trial is ongoing and evidence is still being
> received. A purported party official also states that lawyers from the
> executive branch have been sent to assist the judge in writing the
> decision. The recorded meetings also show an individual who
> claims to be a representative of Ecuador's ruling political party,
> Alianza PAIS, seeking $3 million in bribes in return for handing out
> environmental remediation contracts to two businessmen after the
> verdict is handed down. Of that sum, he said $1 million would go to
> Judge Juan Nuñez, $1 million would to 'the presidency' and $1
> million to the plaintiffs.[12]

18

Chevron stated that the videos were made by two "prospective environmental remediation

19

contractors,"[13]  Mr. Borja (who Chevron admitted had worked for it as a "logistics contractor")

20

and Wayne Hansen (who Chevron described as a U.S. businessman with whom it had no

21

relationship).

22

The facts turn out to be quite different from Chevron's representations.  Inquiries initiated

23

by Ecuadorian Plaintiffs revealed that the supposed representative of *Alianza Pais* turned out to

24
25
26

[12] *See, e.g.*, Hall Decl., Ex. C, Chevron Press Release, *Videos Reveal Serious Judicial Misconduct and Political Influence in Ecuador Lawsuit* (August 31, 2009).

27

[13] Hall Decl., Ex. D, Letter from T. Cullen to W. Pesántez (Aug. 31, 2009).

28

7

1    be a car salesman with no connection to the party, who was apparently "excited" to meet with

2    Borja and Hansen, and who "exaggerated" his connections and authority in his desire to profit

3    from Borja and Hansen's offers.[14]  Hansen, who Chevron very generously presented as a "U.S.

4    businessman"[15] is actually a convicted drug trafficking felon with an extraordinarily suspect past

5    but with no history in environmental remediation.[16] Borja's "logistics" work for Chevron appears

6    to have been regular for over five years and apparently included miss handling scientific

7    evidence, setting up shell companies with only nominally independent labs, and other dubious

8    operations.[17]

9         Though Chevron at first expressly disavowed any involvement in the plot, it later came to

10   light that, on June 18, 2009, before recording his final meeting in Ecuador with the supposed

11   party representative but actual car salesman, Borja first met with Chevron attorneys and

12   representatives in San Francisco and then returned to continue his recordings.[18]  Chevron asserted

13   that "neither man had been paid to provide the recordings to Chevron," but in fact Chevron,

14   allegedly out of concern for Mr. Borja's safety, relocated Borja and Portilla to the United States,

15   providing the tow with a luxury $6,000-a-month villa near Chevron's headquarters, and outfitting

16   Borja with a car and "relocation expenses and other interim support."[19]  Chevron has also

17   acknowledged that it is paying for Borja's lawyers and has offered the same to Mr. Hansen.[20]

18

19

20        [14] *See* Hall Decl., Ex. E, Brasileiro, Adriana & Karen Gullo, *Ecuadorean Car Salesman Denies Seeking Bribe in Chevron Case*, BLOOMBERG, Oct. 1, 2009.

21        [15] Hall Decl., Ex. C, Chevron Press Release.

22        [16] Hall Decl., Ex. F, G. Fine, *Report of Investigation* (Oct. 29, 2009).

23        [17] Hall Decl., Ex. G, G. Fine, *Report of Investigation* (Apr. 5, 2010); Hall Decl., Ex. J,
24   Excerpts of October 1, 2009 Skype transcripts documenting conversations between S. Escobar and D. Borja, at 29-34 [13:03 p. 5-10].

25        [18] Hall Decl., Ex. H, Letter from T. Cullen to D. García Carrión (Oct. 26, 2009) at 3.

26        [19] Hall Decl., Ex. C (Chevron Press Release); Hall Decl., Ex. H (Letter from T. Cullen to
     D. García Carrión) at 9-10.

27        [20] Hall Decl., Ex. H (Letter from T. Cullen to D. García Carrión) at 9-10.

28

8

1    Following Chevron's highly publicized release of heavily redacted versions of the tapes
2    (complete with English subtitles translated in Chevron's favor), the Republic's Prosecutor
3    General began investigating every person named in Chevron's allegations. The Ecuadorian
4    National Judiciary Council also opened its own investigation on Judge Nuñez. Judge Nuñez
5    denied any wrongdoing, but recused himself to preserve the integrity of the proceedings. The
6    Ecuadorian government was able to obtain full, unredacted copies of Borja's videos from
7    Chevron. Chevron denies that it edited the tapes, and Ecuadorian Plaintiffs want Borja to testify
8    regarding the chain of custody, and the names of any other people who were otherwise involved
9    in editing or handling the recordings.

10    In the full, unedited videos, Hansen, in very crude Spanish, repeatedly tries to coach the
11    judge into saying that the case will be decided against Chevron. The judge steadfastly refuses,
12    instead telling the businessmen that he can't discuss the verdict in advance. After almost an hour,
13    and after Judge Nuñez has stated that he must go to other appointments and is clearly trying to
14    wrap up the meeting, Hansen falsely summarizes for himself what he pretends to have heard,
15    including that Chevron is "el culpable" – which could have been understood as "the guilty one"
16    or could have been understood as Hansen's fumbling attempt to say "the defendant." Or, most
17    likely, it was not understood at all. In point of fact, when viewed objectively, the videos show
18    Judge Nuñez most likely simply trying to brush Hansen off and yet get Hansen out of his office
19    by saying "yes sir . . . yes sir . . . yes, sir."[21]

20

21    [21] *See Ecuador Oil Pollution Case Only Grows Murkier*, N.Y. TIMES, Oct. 9, 2009,
22    *available at* http://www.nytimes. com/2009/10/10/world/americas/10chevron.html (The tapes are
      "not clear . . . whether Judge Nunez was even aware of the plans to bribe him."); *Chevron's Legal*
23    *Fireworks*, L.A. TIMES, Sept. 5, 2009, *available at* http://articles.
      latimes.com/2009/sep/05/opinion/ed-chevron5 ("On the tapes, the men . . . press Nuñez to say
24    how he will rule, without success. Then, as Nuñez prepares to leave, one of the men maintains
      that Chevron is guilty, and Nuñez replies, 'Yes, sir.' . . . But on the video, it's unclear to whom
25    the judge is speaking and whether he is responding to the question or just trying to end the
      meeting."); *Chevron Judge Says Tapes Don't Reveal Verdict*, SFGATE.COM, Sept. 2, 2009,
26    *available at* http://articles.sfgate.com/2009-09-02/business/17204552_1_judge-rules-chevron-
27    businessmen.

28

1    Remarkably, all of Chevron's fabricated bias and bribery accusations are based solely on

2    these "yes sirs". In addition to its media blitz, Chevron filed a motion in the Lago Agrio

3    Litigation requesting that the judge then sitting, Leonardo Ordoñez (who has since been removed

4    by another of Chevron's motions, amounting to even further delay) vacate all activity that took

5    place during Judge Nuñez's tenure. Chevron has also apparently advised Mr. Borja that he will

6    likely be a witness on their behalf in the Bilateral Investment Treaty arbitration it has initiated

7    against the Republic of Ecuador, through which Chevron is collaterally trying to force the

8    Republic to shut down the Ecuadorian Plaintiffs' trial.[22]

9    **V.    Borja Has Since Described His More Complex Relationship With Chevron,
         As Well As His And Portilla's Knowledge And Possession Of Other Evidence.**

10

11   As noted above, Borja himself sketched out the scope and nature of his multi-faceted work

12   on Chevron's behalf. Borja did so in a series of Skype audio conversations and written "chats"

13   that were automatically recorded by his long-time acquaintance, Santiago Escobar. Escobar

14   voluntarily came forward with the information because he was disgusted by Mr. Borja's

15   descriptions of his own behavior.[23] In these recordings Mr. Borja reveals that he has worked for

16   Chevron since at least 2004,[24] and has formed at least four companies that contracted with

17   Chevron, in order to falsely create the appearance of independence between the companies and

18   Chevron.[25] Sara Portilla also worked for Chevron and both Borja and Portilla signed multiple

19   documents as the "representatives" of Severn Trent Labs, a supposedly independent lab that

20

21

22   [22] Hall Decl., Ex. I, Excerpts from Message Log (Nov. 26, 2009), at 4 [p. 21-22]; Hall
     Decl., Ex. J, Excerpts of October 1, 2009 Skype transcripts documenting conversations between
23   S. Escobar and D. Borja at [12:51 p. 3 & 13:03 p. 1]. The full transcripts are also included as
     Exhibits 39, 40, 41, 46, 48 & 49-52 in Rec. Docs. 2-5, 2-6, 2-7 & 2-8 in the *In re Republic of*
24   *Ecuador*, Case 1:10-mc-00040-GSA (E.D.Cal. filed 09/14/2010); they are also *available at*
     http://chevrontoxico.com/news-and-multimedia/borja-report/audio-and-chat-files.html.
25
     [23] Hall Decl., Ex. G, G. Fine, *Report of Investigation* (Apr. 5, 2010).
26
     [24] Hall Decl., Ex. J at 13, 36 [Oct. 1, 2009 12:36 at 13, 14:04 at 6].
27
     [25] Hall Decl., Ex. J at 32-34 [Oct. 1, 2009 13:03 at 8-10].
28

1  tested Chevron's samples from the Lago judicial site inspections.[26]  Borja's uncle owns the
2  building where Chevron's attorneys are located and has worked for Chevron for about 20 or 30
3  years.[27]  Moreover, Borja and his Chevron "boss" attempted to infiltrate a lab used by the
4  Ecuadorian Plaintiffs, using false names to enter the premises.[28]

5      While working to maintain a good relationship with Chevron because he "prefer[s] to
6  have powerful friends,"[29] Mr. Borja said that he possesses incriminating evidence, which is the
7  subject of the subpoena the Ecuadorian Plaintiffs are requesting this Court authorize:

8        I have the [e]mails, I have a lot of things .... Did you think I was
      going to jump into the water without that? ... [Chevron's] shit!  I
9        have correspondence that talks about things you can't even
      imagine, dude. I mean things that ... for them can ... it's, I can't talk
10        about them here, dude, because I'm afraid, but they're things that
      can make the Amazons win this just like that [snapping fingers] ....
11        I mean what I have is conclusive evidence, photos of how
12        [Chevron] managed things internally.[30]

13  Mr. Borja also claims that if the U. S. court that sent the *Aguinda* case to Ecuador "found out that
14  [Chevron] did all that, they'll never believe anything they say."[31]  While Mr. Borja also made it
15  clear that Chevron could not actually pay him in cash prior to testifying, he anticipates a grand
16
17
18

19      [26] Hall Decl., Ex. J at 13, 37-38 [Oct. 1, 2009 12:36 at 13, 14:04 at 7-8]; Hall Decl., Ex. K,
20  examples of Chain of Custody Records and Analysis Report pages signed by Mr. Borja and Sara
Portilla.

21      [27] Hall Decl., Ex. I, Message Log, at 3 [p. 20-21]; Hall Decl., Ex. J, at 37-38 [14:04 p. 7-
22  8].

    [28] Hall Decl., Ex. J at 39-41 [14:04 p. 9-11].
23
    [29] Hall Decl., Ex. I, Message Log, at 1 [p. 7]; Hall Decl., Ex. J at 3 [12:06 at p. 4].
24      [30] Hall Decl., Ex. J at 16-17 [12:36 p. 8-9].

25      [31] Hall Decl., Ex. J at 34-35[13:03 p. 10-11].
26
27
28

11

1   future provided by Chevron.[32] Meanwhile, Chevron pays Borja and Portilla's expenses, including

2   their $6,000 per month house rent in San Ramon and attorneys fees.[33]

3        Borja also said that he destroyed another clandestine videotape he made, but he did not

4   explain why.[34] He said that what is shown on the videos amounts to only a fraction of what he

5   knows. Ecuadorian Plaintiffs seek this subpoena, in part, to find out what other information Borja

6   knows.[35] Borja also apparently told Escobar in person that Borja ran Chevron's "dirty tricks

7   operation" in Ecuador, in which he, *inter alia*, dumped soil samples from contaminated sites and

8   replaced the soil with clean soil from other locations, then submitted the samples to the lab that he

9   and Portilla managed in support of Chevron's defense in Lago Agrio litigation.[36] Ecuadorian

10  Plaintiffs also seek more information from Borja and Portilla about these activities.

11       Borja has also described how Chevron has investigated him and has access to seemingly

12  infinites sources of information and influence.[37] It has recently come to light that Kroll, Inc. has

15  [32] Hall Decl., Ex. J at 5, 10 [12:06 p. 6; 12:21 p. 11]; Hall Decl., Ex. L, Excerpts of
16  October 7, 2009 Skype transcript documenting conversations between S. Escobar and D. Borja, at
    2-4 [p. 11-13].

17  [33] Hall Decl., Ex. J at 12-13 [12:21 p. 13-14]; Hall Decl., Ex. H (Letter from T. Cullen to
18  D. García Carrión) at 9-10.

    [34] Hall Decl., Ex. M, Excerpts of October 31, 2009 Skype transcript documenting
19  conversations between S. Escobar and D. Borja at 4-5 [p. 34-35].

20       [35] Hall Decl., Ex. J at 16 [12:36 p. 8], Hall, Ex. M at 1-8 [p. 31-38].

21       [36] Hall Decl., Ex. N, two articles regarding Santiago Escobar: Reddall, Braden,
    *Ecuadorean in Sting Could Turn on Chevron-Friend*, THOMSON REUTERS (Apr. 6, 2010),
22  *available at* http://www.reuters.com/assets/print?aid=USN0614269920100406; *Diego Borja
    Sánchez pretendió que evidencias sean ofrecidas a indígenas y al gobierno de Ecuador*, Ecuador
23  InMediato.com (Apr. 10, 2010), http://www.ecuadorinmediato.com/Noticias/news_user_
    view/habrian_propuesto_a_santiago_escobar_comercializar_pruebas_en_contra_de_chevron_aud
24  io--128110 (last visited Dec. 1, 2010). *See also* radio interview with Santiago Escobar (in
25  Spanish) on June 9, 2010, *available at*
    http://www.ecuadorinmediato.com/Noticias/news_user_view/habrian_propuesto_a_santiago_esco
26  bar_comercializar_pruebas_en_contra_de_chevron_audio--128110.
    [37] Hall Decl., Ex. O, Excerpts of October 18, 2009 Skype transcript documenting
27  conversations between S. Escobar and D. Borja at 1-10.

been acting on Chevron's behalf in Ecuador.[38]  Ecuadorian Plaintiffs seek any information that Borja or Portilla may have regarding Chevron's relationship with investigators or security contractors, including current and former members of the Ecuadorian military.

## ARGUMENT

I.     **Under 28 U.S.C. § 1782 The Ecuadorian Plaintiffs Are Entitled To The Requested Discovery**

The discovery sought by the Ecuadorian Plaintiffs is precisely the sort of discovery contemplated by 28 U.S.C. § 1782.  To obtain discovery under 28 U.S.C. § 1782, the applicant must satisfy statutory requirements and the balance of several discretionary factors should weigh in favor of discovery. A subpoena under § 1782 may be issued consistent with the Federal Rules of Civil Procedure where: (i) the targets of the subpoena reside or are found in this Court's district, (ii) the discovery is sought for use in a foreign or international proceeding, and (iii) the applicant is an interested person in the foreign proceeding.  Those requirements are easily met here.

In addition, issuance of the subpoenas is supported by the four discretionary factors articulated by the Supreme Court in *Intel*.  These four factors are: "(1) whether the person from whom discovery is sought is a participant' in the foreign case; (2) the nature and character of the foreign proceeding, and whether the foreign court is receptive to judicial assistance from the United States; (3) whether the discovery request is an attempt to avoid foreign evidence-gathering restrictions; and (4) whether the discovery request is 'unduly intrusive or burdensome.'"[39] Applied to this application, the requested discovery clearly meets the showings required by § 1782 and is relevant the Lago Agrio Litigation.

---

[38] Hall Decl., Ex. P, Cuddehe, Mary, *A Spy in the Jungle*, THE ATLANTIC (Aug. 2010), *available at* http://www.theatlantic.com/international/archive/2010/08/a-spy-in-the-jungle/60770/.

[39] *London* v. *Does 1-4*, 278 Fed. Appx. 513, 515 (9th Cir. 2008) (quoting *Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004)).

### A.   The Discovery Sought Satisfies The Statutory Requirements Of § 1782 And Is Highly Relevant To The Lago Agrio Litigation

Section 1782 authorizes federal district courts, "upon the application of any interested person," to order discovery of a "person [who] resides or is found" in the district for use in a proceeding "in a foreign or international tribunal."[40] Those statutory requirements are met here.

First, there can be no question that Mr. Borja and Ms. Portilla are both residents of this District. Mr. Borja and Ms. Portilla both currently reside in San Ramon, CA (in the luxury villa paid for by Chevron), and therefore are residents of this District and properly subject to § 1782 discovery in this District.[41]

Second, the discovery the Ecuadorian Plaintiffs seek is "for use" in a pending proceeding before a foreign tribunal, that foreign tribunal being the Provincial Court of Nueva Loja which is currently considering the Ecuadorian Plaintiffs' claims against Chevron and by any future appellate body in Ecuador, should Chevron or the Ecuadorian Plaintiffs exercise an appeal.

Third, as a party to the Lago Agrio Litigation, the Ecuadorian Plaintiffs are "interested persons" for purposes of § 1782 discovery. *See Intel*, 546 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."); *see also*, *e.g.*, *In re Merck & Co.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000) ("interested persons" include parties to international proceedings). The threshold statutory requirements for § 1782 discovery are clearly met.

This is exactly the type of discovery contemplated in § 1782. Where the information sought is relevant, it is "presumptively discoverable" under § 1782.[42] The limited discovery sought here relates directly to the evidence in the Lago Agrio litigation, and to issues of Judge Nuñez's purported judicial misfeasance falsely raised by Chevron in the Lago Agrio litigation: documents and testimony including that relating to Borja's and Portilla's (1) employment history,

---

[40] 28 U.S.C. § 1782(a).

[41] *See* footnote 33, *supra*.

[42] *In re Bayer AG,* 146 F.3d 188, 195-96 (3d Cir. 1998).

14

1    (2) past and current relationship with Chevron, (3) handling of soil samples and other scientific

2    evidence related to the Lago Agrio Litigation, (4) role in Chevron's "dirty tricks" operations as

3    described by Mr. Borja, and (5) meetings with Mr. Hansen, Judge Nuñez, the car salesman

4    Garcia, and other purported Ecuadorian government officials and attorneys allegedly implicated

5    in the fabricated "bribery scandal," (6) identities of the people who edited and otherwise altered

6    or translated he "bribery scheme" recordings, (7) information regarding Kroll, Inc.'s role acting

7    on Chevron's behalf in the Lago Agrio litigation, and (8) any other information that Mr. Borja or

8    Ms. Portilla possesses regarding the Lago Agrio litigation.   Thus, this application easily meets §

9    1782's requirements; and this Court may grant the requested discovery.

10                      **B.**     **The *Intel* Discretionary Facts Also Favor Granting the Requested**
                                   **Discovery**
11

12            As stated, *supra*, The Supreme Court in *Intel* directed district courts to also consider four

13    factors when deciding whether to grant a § 1782 application.[43]   Each *Intel* factor favors granting

14    this application.

15            First, Mr. Borja and Ms. Portilla are not parties to the Lago Agrio Litigation, a factor

16    favoring discovery.[44]   While, in the ordinary case, the Lago Agrio Court "has jurisdiction over

17    those appearing before [it], and can itself order them to produce evidence,"[45] the Ecuadorian court

18    hearing the Lago Agrio Litigation does not have jurisdiction over Mr. Borja or Ms. Portilla, both

19    of whom reside in the United States and are outside the court's jurisdiction.   In fact, there is

20    evidence that suggests Chevron has taken steps to ensure that Mr. Borja and Ms. Portilla do not

21    remain within the reach of the Ecuadorian court.   Chevron has acknowledged providing financial

22

23            [43] *London* v. *Does 1-4*, 278 Fed. Appx. 513, 515 (9th Cir. 2008) (quoting *Intel*, 542 U.S. at
         264-66).

24            [44] *See Intel*, 542 U.S. at 264 ("(1) whether the person from whom discovery is sought is a
25    participant in the foreign case; (2) the nature and character of the foreign proceeding, and whether
       the foreign court is receptive to judicial assistance from the United States; (3) whether the
26    discovery request is an attempt to avoid foreign evidence-gathering restrictions; and (4) whether
       the discovery request is 'unduly intrusive or burdensome.'").

27            [45] *Intel*, 542 U.S. at 264.

28

                                                    15

1   support to Mr. Borja and Ms. Portilla, which has allowed the Respondents to escape the

2   Ecuadorian court's jurisdiction and live in the United States.[46] Chevron is supporting them in this

3   district, and as a result, the Ecuadorian court cannot get jurisdiction over them.

4        Second, it cannot be said that the Ecuadorian court hearing the Lago Agrio litigation is not

5   receptive to judicial assistance from the United States. United States courts have routinely

6   authorized discovery for matters pending in Ecuadorian courts.[47] Eighteen federal courts have

7   reached decisions in related § 1782 proceedings brought by Chevron against the Ecuadorian

8   Plaintiffs' consultants, experts, and attorneys. Each federal court granted Chevron discovery in

9   aid of its defense in the Lago Agrio litigation.

10       Third, this Application is not an attempt to avoid foreign evidence-gathering restrictions;

11   Borja and Portilla have been directly involved in the Lago Agrio litigation for years, but have left

12   Ecuadorian jurisdiction under Chevron's protection and have avoided testifying regarding this

13   case.[48] Furthermore, Chevron brought multiple motions in the Ecuadorian court hering to the

14   Lago Agrio litigation, to which the requested evidence is responsive – relying both on Mr. Borja's

15   videotapes in support of the motions to annul rulings by Judge Nuñez and on scientific samples

16   handled directly by both Mr. Borja and Ms. Portilla to support other motions and submissions.

17   The Application represents a good-faith effort to obtain probative evidence on these and other

18   points critical to the Lago Agrio litigation. The Ecuadorian Plaintiffs are unaware of any

19   restrictions by the Ecuadorian court hearing the Lago Agrio litigation that would affirmatively

20   prohibit the discovery sought here.

21       Fourth, the Ecuadorian Plaintiffs' Application is not unduly intrusive or burdensome. Mr.

22   Borja's and Ms. Portilla's evidence is directly relevant to the Lago Agrio litigation. The

23

24        [46] *See* footnote 33, *supra.*

25        [47] *See, e.g.*, *In re Compania Chilena de Navegacion Interoceanica S.A.*, Case No. 03 CV

26   5382 (ERK), 2004 U.S. Dist. LEXIS 6408, at \*12-13 (E.D.N.Y. Jan. 29, 2004); *In re Noboa*, Nos.
MI8-302, M19-111, 1995 U.S. Dist. LEXIS 14402, at \*1-2,11-12 (S.D.N.Y. Oct. 3, 1995).

27        [48] *See* pages 10 through 13, *supra.*

28

document requests and depositions are tailored to discover their knowledge of related topics and the veracity of Mr. Borja's accusations against Judge Nuñez and the proceedings during his tenure. Further, Mr. Borja and Ms. Portilla have been working for Chevron for years, and although they are apparently no longer technically "working" for Chevron, they are apparently still financially supported by Chevron in this district.[49] Furthermore, Mr. Borja willingly and eagerly injected himself into this dispute and has stated that he knows he may be called as a witness in related proceedings.[50] Mr. Borja is also already on notice that he might become involved in the proceedings, because the Republic of Ecuador has filed a similar request seeking different but overlapping evidence.[51]

Certainly, this action cannot be viewed as any more burdensome than the discovery Chevron has successfully obtained from non-parties to the Lago Agrio Litigation from nineteen United States Federal District Courts under the auspices of 28 U.S.C. § 1782. Chevron has repeatedly requested and received § 1782 subpoenas, seeking discovery from at least twenty-five (25) separate non-parties affiliated (or at one time affiliated) with the Ecuadorian Plaintiffs. The result of Chevron's repeated actions: over 275,000 pages of document discovery, and more than fifteen depositions. The Ecuadorian Plaintiffs urgently need this discovery to correct the massive imbalance in § 1782 discovery vis-à-vis the parties to the Lago Agrio Litigation, and to respond to Chevron's motions, to enter additional evidence into the record, and to prepare a likely future appeal. In shot, after first forcing the Ecuadorian Plaintiffs to litigate their claims in Ecuadorian courts, Chevron has done everything in its power to subvert the Ecuadorian Plaintiffs pursuit of justice there. The Ecuadorian Plaintiffs seek the discovery sought through this Appication to defend themselves against these attacks and assist them in bringing to a just conclusion litigation

---

[49] *See* pages 10 through 13, *supra*.

[50] Hall Decl., Ex. J at 25-26, 27, [12:51 at 3-4, 13:03 at 1].

[51] *See* Order Granting in Part and Denying in Part Diego Borja's Motion to Quash; and Granting Applicant's Motion to Join, Rec. Doc. 39, *In Re Republic of Ecuador*, No. 3:10-mc-80225-CRB (N.D.Cal. filed 12/01/2010).

17

before this foreign tribunal. It is precisely for such purposes that § 1782 was enacted, and the Ecuadorian Plaintiffs respectfully request that their Application for relief under it be granted.

## II. The Requested Discovery Is Needed On An Expedited Basis And This Court Should Enter An Abbreviated Briefing Schedule

The Ecuadorian Court has previously written that a final judgment in the Lago Agrio litigation can be entered, as early as February 2011.[52] The Lago Agrio Plaintiffs need the discovery obtained from Mr. Borja and Ms. Portilla prior to the entry of judgment to respond to Chevron's extensive motion practice, prepare closing arguments, and add to the Ecuadorian court's evidentiary record for use in any potential appeal proceeding.

## CONCLUSION

For the foregoing reasons, the Ecuadorian Plaintiffs respectfully request that this Court grant their Application and permit them to issue the requested subpoenas under 28 U.S.C. § 1782 and enter an abbreviated briefing schedule on the Application and any objections or motions directed to the subpoenas.

Respectfully Submitted

Dated: December 30, 2010

Law Office of Joseph C. Wilson

By: _____
Joseph C. Wilson
5A Funston Avenue
San Francisco, CA 94129
Phone: (415) 420-4009
Fax: (415) 796-0875

Carlos A. Zelaya, II (*Pro Hac Vice Pending*)
F. Gerald Maples, P.A.
365 Canal Street, Suite 2650
New Orleans, LA 70053
Phone: 504-569-8732
Fax: 504-525-6932
*Attorneys for Applicants*

---

[52] *See* Hall Decl., Ex. Q, Letter from Lago Agrio Court to BIT Tribunal (June 17, 2010). Chevron has gone to great lengths to delay the entry of any final judgment and it is possible that a judgment will be entered later than February 2011.

18